## HALL *v.* STATE

[No. 186, October Term, 1956.]

*Decided May 13, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HAMMOND and PRESCOTT, JJ., and HORNEY, J., Chief Judge of the Second Judicial Circuit, specially assigned.

*Weldon Leroy Maddox* for the appellant.

*E. Clinton Bamberger, Jr., Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *C. Osborne Duvall, State's Attorney for Anne Arundel County,* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

The appellant, Charles Bradley Hall, appeals from a conviction for assault with intent to kill and murder Steve Foundas in a case tried before the trial judge without a jury.

Mr. Foundas testified that when he returned to his home at 94 Franklin Street in Annapolis on the night of February 16, 1953, he found it open and all of his clothes and possessions, including $1,350.00 in cash stolen and the lights and his telephone disconnected. He left the house about 8 A. M. the next morning, February 17th, and returned in the afternoon and put safety locks on the doors and let the maid in to clean. Previously that day he had borrowed a gun from Mr. Eddie Leonard which he gave to the maid. He told her to put it on the bed in his bedroom. The gun was at that time offered in evidence, without objection. He then went to his garage at 117 Conduit Street and stayed there until 5:30 P. M. He then returned home, took the maid to West Annapolis, came back and ate his supper at the Royal Restaurant on West Street. He finished eating about 6:15 P. M. and, although he was frightened, he returned home. He opened the door, went upstairs to the bathroom, went in his room, snapped on the light and saw "him" with a black handkerchief "tied up like here". He started out of the room but before he got out "he" hit him with a bar which "he" had in "his" hand and he does not remember what happened after that. The sum of $450.00 was missing from his pocketbook. When asked: "Did you recognize him?", he answered: "Certainly." He remembers that he was hit twice but he was injured in five places. He had known Hall about a year previously. He had worked for him two or three days when he lived in Bay Ridge and at that time Hall stole a gun from him. When asked whether he got "a

good look at what the person had in his hand whom you identified as Hall", he answered: "No sir, because he just looked that a way, had the back of his neck to me." He did not get a good look at him. He was in the hospital six or seven weeks. The State then offered in evidence the hospital record and charts showing the extent of Foundas' injuries. When this was offered, the attorney for the defendant stated: "No objection."

Lieutenant Howes, of the Annapolis Police Department, testified that he went to Foundas' home on February 17, 1953. The first call came to the Police Department at 12:02 A. M. and the second call at 7:01 P. M. He responded to both calls. In response to the 7:01 call he rapped on the door and Foundas tried to let him in but could not get the front door open. He looked through the window and saw the rugs "all messed up" in the hallway. He was then let in the side door. When he got inside he saw that Foundas' eye was swollen and blood was running from his face and head. On the second floor, at the head of the stairway, was a pool of blood, Foundas' diamond wristwatch, and a crowbar. This crowbar, after identification by Lieutenant Howes, was offered in evidence without objection. He then took Foundas to the Annapolis Hospital.

Captain Musterman, of the Annapolis Police Department, testified that he arrived at the Foundas' home shortly after 7:15 P. M. on February 17, 1953. He found that the light bulbs in the hall, the middle room, and in Foundas' bedroom had been unscrewed. He also found three sets of latent fingerprints on the chifforobe in Foundas' room. After the prints were powdered and photographed and lifted, they were sent to the Federal Bureau of Investigation with a list of suspects other than the defendant, Hall, for examination. Hall's name was not submitted at that time as a suspect. Later on he found out that Hall had been on parole from the State of California. He wrote to the Parole Board at Sacramento and was advised that Hall was on parole but they did not know where he was at that time. He was later advised that they had Hall's fingerprint card and that he had been apprehended in Fresno, California, on February 28th. He

requested "an identification man at Federal Bureau of Investigation" to check Hall's prints with the latent prints which he had sent them. He received a report that one of the fingerprints was identified as that of Charles Bradley Hall, one of Foundas, and one of the maid. Through the sheriff at Fresno and through the Federal Bureau of Investigation it was found that at the time Hall was apprehended he had three guns and clothes in his possession. The three guns were sent to him by the sheriff in Fresno by express. One of the guns was the same one that Foundas had obtained on February 17th from Leonard's Sporting Goods store and which Foundas had taken to his home, given to his maid, and which the maid had placed upstairs in the bedroom. The number on the gun corresponded with the number of the gun obtained by Foundas from Mr. Leonard. Captain Musterman further testified that he first saw the defendant on October 16, 1956, at San Quentin Prison in California. With another officer he brought Hall back to Annapolis, arriving on October 18th. On the 19th Hall was fingerprinted and his picture taken. The next day Hall was brought to police headquarters. He did not promise Hall anything, did not threaten him in any way, and did not offer him any inducements. Hall said he would rather not give a statement, he would rather see his attorney first. However, he did give an oral statement. Captain Musterman then related without objection what Hall told him. He said he had been in Annapolis and "committed crime". He had attacked Foundas and he wanted to get it over with as soon as possible. He said he had come to Annapolis from California "to work Mr. Foundas over". Previous to his leaving to go in the service he was employed by Foundas at Bay Ridge. Foundas had accused him of stealing his wallet with $1,500.00 in it. This wallet was later returned. He said a friend of Foundas, who was with him at that time, threatened to beat him and Foundas had fired him. He "had a vengeance against Foundas and wanted to work him over". That was the reason he came to Annapolis where he registered at a hotel in the name of Charles Bradley King. The hotel records could not be checked because the management had been changed.

The first time he broke into the house Foundas, the maid, and a friend of Foundas, Mr. Apostol, who was fixing the locks on the doors, were in the house. The maid came upstairs and put the gun on the bed. Hall stated that he was in the room upstairs while they were in the house. When the maid came in the bedroom she put the gun on the bed, "frizzed" her hair before the mirror and then left. As soon as she left he put the gun in his pocket and after Foundas, Mr. Apostol, and the maid left, he then left. He said on the second visit he entered the house through the cellar entrance. He attacked Foundas with his fist. He denied taking any money from him. He admitted that at the time he was apprehended in Fresno he had $1,300.00 which he had earned. The clothing and the rest of the articles he had were kept by the sheriff in Fresno.

The attorney for the defendant in this Court did not represent him in the trial below. No objection was made below by the defendant or his attorney to the admissibility of any of the aforesaid evidence. Among the matters which the defendant's attorney contends should not have been admitted in evidence were the gun, the crowbar, the hospital records and the report on the fingerprints. He contends that other evidence was too vague and indefinite to be admitted and, if these inadmissible matters had not been admitted, there was not sufficient evidence to convict the defendant.

It is clear that a waiver as to inadmissible evidence operates with full effectiveness and the result is that evidence so admitted is given the same probative force as if it were competent. *Martin v. State*, 203 Md. 66, 73, 98 A. 2d 8, and cases there cited. This case was tried on November 5, 1956. Rule 9 of the Court of Appeals, in effect at that time, provided that this Court shall not decide any point or question which does not plainly appear by the record to have been tried and decided by the court below. *Grammer v. State*, 203 Md. 200, 214, 100 A. 2d 257. In *Madison v. State*, 200 Md. 1, 8, 10, 87 A. 2d 593, where the defendant had been convicted of murder and sentenced to death, the contention was made that by reason of non-action certain serious errors were made and inadmissible matters were admitted in evi-

dence, and these errors should be corrected without regard to the rules of law ordinarily governing appeals. This Court was there told that the failure to raise questions below, which were raised in this Court, was due to the fear of prejudicing defendant before the jury by objections. Judge Markell quoted Rule 9 aforesaid and stated: "We are aware that some lawyers include such 'taboos' in their 'trial tactics'— and others, who have attained reputation as trial lawyers, make any objections they deem substantial and press them to the end. We are, however, without authority to review errors in trial tactics of defense counsel or to speculate as to possibilities that different tactics might have produced a different result. * * * Whatever 'plain error material to the rights of the accused' may include, it does not include bad guesses by counsel whether or not to object to anything done or left undone by the court."

Assuming, without deciding, that these so-called inadmissible matters should not have been admitted in evidence we are of opinion that even without these there was relevant admissible evidence which would properly sustain a conviction. If the assault was committed under circumstances such that, if death ensued, the crime would have been murder in either the first or second degree, it is not necessary to sustain such a charge that a specific intent to take life should be shown. *Webb v. State,* 201 Md. 158, 162, 93 A. 2d 80; *Davis v. State,* 204 Md. 44, 49-51, 102 A. 2d 816.

In evidence is the statement from the accused. If it be considered a confession it appears that a proper foundation was laid. The evidence necessary to corroborate a confession need not establish the *corpus delicti* beyond a reasonable doubt. It is sufficient if, when considered in connection with the confession, it satisfies the trier of fact beyond a reasonable doubt that the crime was committed and that the defendant committed it. *Wood v. State,* 192 Md. 643, 650, 65 A. 2d 316. Appellant contends that this was merely an admission which is a statement by the accused, direct or implied, of facts pertinent to the issue and tending, in connection with proof of other facts, to prove his guilt but is of itself insufficient to authorize a conviction. *Delnegro v. State,* 198 Md. 80,

87, 81 A. 2d 241. In this claimed admission Hall said he had been in Annapolis and "committed crime". He had attacked Foundas and wanted to get it over with as soon as possible. He had come to Annapolis to "work Foundas over". He went to the house the first time and found Foundas, the maid and Mr. Apostol there. Mr. Apostol was fixing the locks on the doors. The maid came upstairs and put the gun on the bed and when she left he took the gun. On the second visit he attacked Foundas with his fists. Corroborating this statement is Foundas' testimony that he brought the maid to the house to do the cleaning and that he had borrowed a gun that afternoon and gave it to the maid to put on the bed in the bedroom. The safety locks were put on the doors that afternoon. Defendant had worked for Foundas before and at that time had stolen another gun from him. Although Foundas' identification of Hall cannot be said to be of the most definite character, he testified that he would and did recognize his assailant.

Rule 7 (c), Criminal Rules of Practice and Procedure, provides that when a criminal charge is tried by the court sitting without a jury, upon appeal this Court will not set aside the verdict of the trial court on the evidence unless clearly erroneous, and due regard shall be given to the opportunity of the trial judge to judge of the credibility of the witnesses. *Stokes v. State,* 202 Md. 166, 170, 95 A. 2d 871. Whether the defendant's statement to Captain Musterman was a confession, which we think it was, or admission, there was evidence to corroborate some of the details. There is no doubt the crime was committed and that Foundas was severely beaten. We cannot say that the trial judge was clearly wrong in finding that Hall without justification or excuse and with intent committed the assault upon Foundas and that, if Foundas had died, Hall would have been guilty of murder.

*Judgment affirmed, with costs.*