511 A.2d 1110

**Britt D. GLENN**

v.

**STATE of Maryland.**

**No. 1607, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

July 15, 1986.

Certiorari Denied Nov. 5, 1986.

Gary Huddles and Peter Max Zimmerman, Towson, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Kurt L. Schmoke, State's Atty. for Baltimore City and William McCollum, Asst. State's Atty. for Baltimore City on brief), Baltimore, for appellee.

Argued before MOYLAN and ADKINS, JJ., and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

MOYLAN, Judge.

The crime of Assault with Intent to Murder went on the books in 1809. In 177 years, there has not been a single in-depth discussion of the special mental element that is the heart of the offense, with the lone exception of *Jenkins v. State,* 59 Md.App. 612, 477 A.2d 791, *cert. granted,* 302 Md. 46, 485 A.2d 269 (1984), in which Judge Wilner compared the intent to murder with the intent to maim, disfigure, or disable. Relatively late in the life of the crime, several inadvertently adopted observations about the mental element were made. Then, through an appellate process consisting largely of scissors and paste, those initial and uncritical observations came to be regularly repeated. There has never been, however, anything approaching a comprehensive analysis.

The appellant, Britt D. Glenn, was convicted in the Circuit Court for Baltimore City by Judge Milton B. Allen, sitting without a jury, of both assault with intent to murder and the possession of marijuana. He does not challenge his conviction on the possession charge. Neither does he ques-

tion the propriety of a conviction for simple assault. It is only the aggravating *mens rea* of a specific intent to murder that is in issue.

Reversing the conviction for assault with intent to murder is easy. Explaining the reasons for the reversal in a way that may help forestall future reversals is more difficult.

The trial judge erred by following time-honored but misleading appellate road signs. The state's attorney erred by plying the trial judge with dilapidated *dicta* from a pre–1975 Baroque Age. The attorney general erred by beguiling us with the wrong part of a partial truth. The real source of error, however, is neither judge nor prosecutor nor appellate advocate but a case law still sadly riddled with imprecise generalities, elusive half-truths, and grandiose jabber.

By 1975, the case law on both consummated and inchoate criminal homicide had become, in Maryland and throughout the common law world, a Kafkaesque hall of mirrors. The first impression was dazzling, as orotund formulae were rhythmically and ritualistically intoned. The inner hollowness became apparent, however, once someone dared to ask the dreaded question, "What, precisely, does all of that mean?" The rich tapestry, like the Emperor's new clothes, turned out to be a crazy quilt of misstatements, partial statements, and even contradictory statements. One close look exposed the verbal brocade as tatterdemalian.

In 1975, the Supreme Court, in *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), and the appellate courts of this state, in *Evans v. State*, 28 Md.App. 640, 349 A.2d 300 (1975), and *State v. Evans*, 278 Md. 197, 362 A.2d 629 (1976), set out to clean the Augean Stables of the accumulated semantic debris and outworn linguistic usages of three centuries. Today's reversal persuades us that the housecleaning needs to be repeated periodically.

Squarely false statements are not the problem. They are easily and effectively eliminated from the case law. The

more elusive, and therefore more tenacious, culprit is the half-truth. Three such half-truths contributed to the error in this case. They are:

1. Assault with intent to murder is an assault under circumstances such that if the victim should die, the crime would be murder.

2. Malice is that which separates murder from man-slaughter.

3. One may infer malice from the directing of a deadly weapon at a vital part of the human anatomy.

None of these statements is false. Yet none of these statements is true. Each is sometimes true and sometimes false with chameleon-like and treacherous unpredictability. Each, moreover, is entrenched doggedly, if not inextricably, in our case law. Our present exhortation to bench and bar is that *none of these statements should ever be uttered or written again*—at least, not in such partial and imprecise a form. We will turn to each of these half-truths as we assess not the evidence of the appellant's culpability but the legal significance of that culpability.

The facts are no longer in dispute (if they ever were). The evidence supported the judge's findings of fact. The facts, so found, were that the 20–year-old appellant stabbed Frank Rizo four times, twice in the arm, once on the right side of the abdomen at the bottom of the rib cage, and once in the waist. Criminal agency was clear. The only issue is whether the appellant stabbed his victim with that aggravating *mens rea* that raises the common law misdemeanor of simple assault to the statutory felony of assault with intent to murder.

### *The First Half-Truth:*
### ASSAULT WITH INTENT TO MURDER IS AN ASSAULT UNDER CIRCUMSTANCES SUCH THAT IF THE VICTIM SHOULD DIE, THE CRIME WOULD BE MURDER.

■ Assault with intent to murder is an inchoate crime, but inchoate to what? Is it inchoate to all of criminal

homicide? Is it inchoate to murder generally? Or is it inchoate to but one particular form of murder?

One cannot analyze the inchoate crime of assault with intent to murder without analyzing the matrix of consummated crimes that constitute criminal homicide. One must hypothesize the death of the assault victim and then determine what the crime would have been in that imagined eventuality.

What is involved is the relationship between the *mens rea* of murder and the *mens rea* of assault with intent to murder. The problem is that since the crime of Assault with Intent to Murder was first placed upon the Maryland statute books in 1809,[1] there has never been an adequate definition of it. Our attempt will be to fill that void.

A simplistic first effort at definition could be, "Assault with intent to murder is an assault under circumstances such that if the victim should die, the resulting crime would be murder." Our pre-*Mullaney* case law was addicted to such simplistic definition.[2] It was, to be sure, at least

---

**1.** By Chapter 138 of the Acts of 1809. It is now codified as Article 27, § 12.

**2.** Maryland first fell into this habit, almost by chance, in *Webb v. State*, 201 Md. 158, 93 A.2d 80 (1952). The issue was the legal sufficiency of the evidence to support a conviction for assault with intent to murder. The evidence showed that the defendant, after making several verbal threats, shot his victim through the neck, the bullet just missing the jugular vein. From the predicate fact of the directing of a lethal weapon at a vital part of the human anatomy, the fact finder could reasonably infer the intent to kill, the prototypal murderous *mens rea*. With no concern for any distinction among the four kinds of murder but only with a view toward making the point that the hypothesized death would have to be at the murderous level of blameworthiness rather than at the manslaughter level, the Court relied upon as its exclusive authority the following statement from Wharton, *Criminal Law* (12th ed. 1932), § 841:

"On an indictment for an assault with intent to murder, the intent is the essence of the offense. Unless the offense would have been murder, either in the first or second degree, had death ensued from the stroke, the defendant must be acquitted of this particular charge."

partially correct. In terms of levels or degrees of blame-worthiness, it served the necessary purpose of separating murder (first or second-degree), on the one hand, from manslaughter, excusable homicide or justifiable homicide, on the other hand—the latter three not representing hy-pothesized predicates which could support a finding of assault with intent to murder. Since that was the only discrimination the courts were being called upon to make in the cases employing that definition, it worked. It did so, moreover, without causing any mischief in the process. For that very same reason, however, the definition has no inadvertent authoritative significance for other distinctions not before the courts and not contemplated by the courts on those occasions.

The definition, on reflection, turns out to be a partial definition. It performs well its sorting function along the appropriate vertical axis, separating the two higher and murderous degrees of blameworthiness above, from man-slaughter and the lesser levels of blameworthiness below. It ignores totally, however, the other possible sorting func-tion along the horizontal axis among the various kinds (as opposed to degrees) of murderous *mentes reae.*

A brief bit of background is perhaps necessary. Since the early seventeenth century, murder has been, in terms of its mental element, a pluralistic rather than a monolithic phenomenon. The key to a conceptual understanding of the law of murder is to think plural. When death results from the act of the homicidal agent, not one but four distinct intents or states of mind are now deemed sufficiently reprehensible to justify a finding of murder. A murder conviction may thus be supported by proof of any one of

---

The definition, even if only partial, was fully competent to deal with the only issue before the *Webb* Court. Without further attribution to Wharton, the statement has since been repeated by the Court of Appeals and the Court of Special Appeals on no less than twenty-two occasions over the ensuing thirty-four years. It has represented virtually the sum total of our analysis of the crime of assault with intent to murder.

four separate *mentes reae.* Without going into elaborate detail, the four types or kinds of murder, each with its distinctive *mens rea,* are almost universally referred to as:

| 1 | 2 | 3 | 4 |
|---|---|---|---|
| INTENT TO KILL MURDER | INTENT TO COMMIT GRIEVOUS HARM MURDER | FELONY-MURDER | DEPRAVED-HEART MURDER |

The presence of one of these intents is an indispensable ingredient, although not the only necessary ingredient, of that slippery legal concept known as "malice." Indeed, the text writers have for 300 years referred to the original murderous *mens rea*—the intent to kill—as "express malice." They have also referred to the latter three murderous *mentes reae*—all of which came into homicide law during its rapid evolution in the early seventeenth century—as the three forms of "implied malice." [3] The original legal fiction, of course, was that any of the latter three states of mind "implied" the former; proof of any of the latter three intents was a predicate fact from which the fact finder could permissibly infer the intent to kill. Legal analysis has now reached a point of sophistication, however, where we recognize that each of these four intents is independently blameworthy enough to support a murder conviction. Each is an autonomous murderous *mens rea* in its own right and not a mere evidentiary avenue to one of the others.

---

**3.** The adjectives "express" and "implied" are now totally misleading. We commented on this unfortunate choice of words in *Evans v. State, supra,* at 28 Md.App. 701, 349 A.2d 300:

"The purely coincidental and unfortunate use of the words 'express' and 'implied' to describe substantive elements suggests nothing whatsoever about the method of proving those elements. Each of the alternative mental elements—whatever its label—may be proved either directly or indirectly as the facts of each case dictate."

The multiplication of criminally homicidal *mentes reae* has been two-dimensional. On the horizontal axis, we have the four kinds of murder—the four distinct types of murderous *mentes reae*. On the vertical axis, moreover, each of the four types comes (at least theoretically) in three degrees of blameworthiness: 1) large, 2) medium, and 3) small—1) aggravated, 2) normal, and 3) mitigated—1) first-degree murder, 2) second-degree murder, and 3) manslaughter. Using representative, but not exhaustive, possibilities, the full matrix could appear:

|  | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| 1st° MURDER (Aggravated) | PREMEDITATED INTENT TO KILL | INTENT TO COMMIT GRIEVOUS HARM (BY POISON) | STATUTORILY DESIGNATED FELONIES | DEPRAVED ACT (BY POISON) |
| 2nd° MURDER (Normal) | INTENT TO KILL | INTENT TO COMMIT GRIEVOUS HARM | FELONY-MURDER DOCTRINE | DEPRAVED ACT |
| MANSLAUGHTER (Mitigated) | HOT-BLOODED INTENT TO KILL | HOT-BLOODED INTENT TO COMMIT GRIEVOUS HARM | MISDEMEANOR-MANSLAUGHTER DOCTRINE | GROSS NEGLIGENCE |

Intentional Killing                    Unintentional Killing

The first vertical column, at the left, involving the "intent to kill" homicides, represents intentional murder, at the higher levels, and voluntary manslaughter, at the mitigated level. The other three vertical columns embrace the unintentional murders,[4] at the two higher levels of blameworthiness, and the involuntary manslaughters, at the mitigated level.

---

4. *See* W. LaFave & A. Scott, *Criminal Law* 607 n. 27 (1972); R. Perkins, *Criminal Law* 51–52 (2d ed. 1969); Clark & Marshall, *Law of Crimes* 564–566 (6th ed., Wingersky rev. 1958).

How many of these twelve kinds and degrees of criminally homicidal *mentes reae* will establish the crime of assault with intent to murder? The partial definition of assault with intent to murder, already in vogue, is serviceable to eliminate the lowest horizontal rank, representing the four basic types of manslaughter. This elimination takes place, of course, because the degree of blameworthiness for that entire rank is less than murderous, whereas the aggravated *mens rea* that needs to be established is a specific intent to murder, not merely a specific intent to kill.

What remains to be decided—what is not covered by the partial definition—is what distinctions need to be made among the vertical files or fundamental kinds [5] (not simply degrees) of homicidal *mentes reae*. This has never yet been squarely addressed by a Maryland appellate decision.

Fortunately, the statute is sufficiently clear to speak for itself. Assault with intent to murder is, by its very wording, a specific intent crime. The obvious question is, "The specific intent to do what?" The obvious answer is, "The specific intent to bring about the death of the assault victim." In terms of the clear and unambiguous meaning of words, it is inconceivable that there could be an intent to murder the victim that did not intend for the victim to die. Except in the pages of Bram Stoker, it simply is not contemplated that the victim of an intended murder will continue to be alive. Intended murder, by definition, com-

---

5. The traditional case law invariably referred to murder in the singular: "We must decide whether, if death had resulted, the crime would have been murder." It never recognized the possibility of a compound question: "We must decide whether it would have been murder and, if so, what kind of murder." The mental hangup, of course, is that one cannot choose among kinds until one realizes that there is more than one kind. The indispensable key is to think plural. An analysis that begins, "Murder is...," is doomed to failure; an analysis that begins, "Murders are...," is already halfway home.

prehends, *inter alia,* an intended killing, to wit, an intent to kill.[6]

There may, of course, be unintended murder without the intent to kill. It is for that reason that an unintended murder (actual or hypothetical) does not establish an anterior assault with intent to murder. Since murder may be unintended as well as intended, it is obviously broader than the intent to murder. The narrow and singular *mens rea* of assault with intent to murder in contrast to the broader and multiple *mentes reae* of consummated murder has been duly noted by the textbook writers. Clark & Marshall, *Law of Crimes* (6th ed., Wingersky rev. 1958), observes, at 651:

> "The fact that the killing would be murder (§ 10.04) is not enough, for there may be murder without any intent to kill. To constitute an assault with intent to murder the specific intent is necessary."

The narrower *mens rea* of the inchoate crime has been similarly commented upon by R. Perkins, *Criminal Law* (2d ed. 1969), at 763:

> "Murder may be committed without an actual intent to take life. 'But to constitute the offense of an assault with intent to murder there must be a specific intent to kill.' Hence it is error to instruct the jury that the same facts and circumstances which would make the offense murder, if death had ensued, will furnish sufficient evidence of intention to convict of assault with intent to murder."

Of the four basic types of murder, specific-intent-to-kill murder is the only one wherein there is a conscious and purposeful design to accomplish the death of the victim. None of the others contains, as a necessary element, any intent that the victim die. A depraved-heart murder is a mere general intent crime—the general intent to do the reckless, life-endangering act with wanton disregard of the human consequences. A felony-murder has no necessary specific intent that harm should come to a victim, let alone

---

**6.** It is, however, more than a simple intent to kill. It is the unjustified, unexcused, and unmitigated intent to kill.

that the victim should die. There is merely a general intent to perpetrate a felony. Some felonies, of course, include lesser specific intents, but not an intent that death result. With respect to both depraved-heart murder and felony-murder, the death of the victim is not only unintended but sometimes not even reasonably foreseen.

In the wake of *Mullaney v. Wilbur, supra,* we began to draw our distinctions more carefully. We noted, in *Blake v. State,* 29 Md.App. 124, 126 n. 1, 349 A.2d 429 (1975):

"It is sometimes stated that the assault must be 'committed under circumstances such that, if death ensued, the crime would have been murder in either the first or second degree.' *Davis v. State,* 204 Md. 44, 50, 102 A.2d 816. That statement, true enough for most cases, is, however, too broad."

In then beginning to draw the more subtle distinctions among the four murderous *mentes reae,* we did not, on that first try, adequately come to grips with intent-to-do-grievous-bodily-harm murder. We did, at least, effectively eliminate the hypothesized felony-murders and depraved-heart murders as predicates for an antecedent assault with intent to murder:

"It would appear equally clear that an assault with intent to murder conviction could not be predicated upon the other two varieties of 'implied malice'—felony-murder or the 'wanton and wilful disregard of unreasonable human risk.'"

29 Md.App. at 127 n. 1, 349 A.2d 429. *And see Finnegan v. State,* 33 Md.App. 251, 255–256, 364 A.2d 124 (1976). The process of analytical sophistication had at least begun with our observation that:

"Since assault with intent to murder requires a specific intent of achieving a particular result, it is clear that it is more restricted in its mental elements than would be the resultant murder itself."

33 Md.App. at 256 n. 1, 364 A.2d 124.

In the case of intent-to-do-grievous-bodily-harm murder, on the other hand, the failure of that intent to establish *ipso*

*facto*—by automatic operation of law—the intent to murder is not so immediately apparent. This is so because there is, in these cases, an actual harm specifically intended for the assault victim. Thus, this form of murder is a specific-intent crime rather than a mere general-intent crime. The critical distinction that needs to be made, however, is between *the results specifically intended,* not *between the presence or absence of a specific intent.* Although there is the purpose or design that the victim should suffer serious physical harm, there is no necessary purpose or design that the victim should die. This was the distinction so ably analyzed by Judge Wilner in *Jenkins v. State, supra,* at 59 Md.App. 618, 477 A.2d 791:

> "An intent to maim, disfigure, or disable [virtually if not completely indistinguishable from the intent to do grievous bodily harm] necessarily falls short of, and thus excludes, an intent to kill. The actor's object in such a case is *not* to end the victim's life, but to have him linger on, either temporarily or permanently, in a disabled or disfigured condition. Conversely, although death is obviously the ultimate form of disablement, it is far more than that; one does not generally regard a killing as merely an extreme form of disablement. It is not the marking or hobbling of the victim that is really intended, but the termination of his very existence. That is the critical, overriding intent, even if death is to be preceded, or caused, by injuries that but for the death would constitute a disfigurement or disablement. Thus, both rationally and realistically, an intent to kill excludes the lesser intent merely to maim, disfigure, or disable." (Emphasis in original).

What seems clear, on serious reflection, is that, where an assault is involved at least, the inchoate form of intent-to-kill murder is assault with intent to murder, whereas the inchoate form of intent-to-commit-grievous-bodily-harm murder is assault with intent to maim, disfigure, or disable.

The persistent difficulty—the inadvertent source of so much misleading appellate language—has been the chronic

failure to distinguish between the evidentiary significance of the intent to commit grievous bodily harm and the legal significance thereof. As an evidentiary matter, the proof of an intent to commit grievous bodily harm can serve, and almost universally does serve, as a legally sufficient predicate to support the inference of the necessary intent to kill.[7]

---

7. If we belabor the self-evident, it is because it is no mean task to extirpate from the case law even a glaring misstatement when that misstatement has been metastasizing for 34 years and has shown up in no less than 22 different spots. The statement, flat out wrong at worst and dangerously misleading at best, is that, "[I]t is not necessary to sustain such a charge [assault with intent to murder] that a specific intent to take life should be shown." *Hall v. State,* 213 Md. 369, 375, 131 A.2d 710 (1957). It sometimes appears in the variant form, "The fallacy of this argument is that it presumes that a specific intent to murder is necessary for a conviction. Such is not the law. It is sufficient if there was an intention to commit grievous bodily harm." *Lawrence v. State,* 2 Md.App. 736, 738, 237 A.2d 81 (1968).

The hope for containment lies in confining the proposition to the only context in which it has thus far been uttered. In each of the cases in which it has appeared, the issue under review was simply the legal sufficiency of the evidence. As an evidentiary matter, of course, the showing of an intent to commit grievous bodily harm is a legally sufficient predicate for the permitted inference of the intent to kill. The careless and inartful phrasing of that unremarkable proposition, however, could lead the unwary to give it legal significance and not just evidentiary significance.

Since all of the later appearances of the statement have been nothing more than uncritical reiterations of its initial utterance, that is the place to look for meaning and for an explanation of the misstatement. Its first appearance in the Maryland case law was in *Webb v. State,* where it appeared as a quotation, with approval, from Wharton, *Criminal Law* (12th ed. 1932), § 841. As we discussed in note 2, *supra,* the only issue before the Court in *Webb* was the legal sufficiency of the evidence to show assault with intent to murder. The shooting of a victim in the neck clearly established a *prima facie* case of an intent to kill and that is the limited holding that could be distilled from the actual facts of the case. Immediately after quoting from Wharton, *Criminal Law,* the Court went on to quote from Wharton, *Criminal Evidence* (11th ed. 1935), § 79, to establish that an intent frequently cannot be proved directly but may be inferred from the conduct of the actor.

The question is, what did Wharton, *Criminal Law,* have in mind when it said, in § 841:

"It has just been stated that a defendant cannot be convicted of an assault with intent to commit murder, unless an intent to commit murder can be proved. It is not necessary, however, to sustain such an indictment that a specific intent to take life should be shown. If

the intent were to commit grievous bodily harm, and death occurred in consequence of the attack, then the case would have been murder in the second degree; and, in case of death not ensuing, then the case would be an assault with intent to commit murder in the second degree."

An immediate clue that something was amiss in this statement from Wharton is that its apparent import was diametrically opposed to the import of the section heading which it ostensibly supported. Section 841 was entitled, "Intent to Kill Essential to Indictment for Assault with Intent to Murder."

An excellent casenote, *Assault With Intent to Murder—Necessity for Actual Intent to Cause Death,* 21 Md.L.Rev. 254 (1961), analyzed this misstatement from Wharton. It showed that the statement was based on a single 1880 case from Tennessee and that Wharton, moreover, had misread the Tennessee case. The casenote pointed out, at 260:

"The authority for Wharton's statement is as uncertain as the rationale. Wharton cites but one case in direct support of his view, and it does not appear to be in point. The case is *State v. Saylor* [74 Tenn. 586]. There, the trial judge quashed an indictment of assault with intent to commit murder in the first degree which alleged a specific intent to murder, but failed to allege premeditation and deliberation. The appellate court reversed, holding that the indictment could be sustained as alleging an assault with intent to commit murder in the second degree since second degree murder does not require premeditation and deliberation. The Court did not indicate that specific intent was unnecessary. The case does not seem to support Wharton's statement that 'specific intent need not be shown', but seems rather to indicate that premeditation and deliberation are not elements of specific intent."

The casenote goes on to point out that, contrary to the statement in Wharton, the majority view of American case law on the subject is that "an actual intent to take life is necessary to establish the offense of assault with intent to murder." *Id.* at 255. In addition to cases from a number of states, it cites as authority 1 Warren *Homocide* (perm. ed. 1938), § 129, at 568, which states that "an intent merely to inflict great bodily injury, or to do serious bodily injury or to punish or torture is not sufficient."

The Wharton mistake seems to arise from the misbegotten notion that a specific intent to kill is, *ipso facto,* the *mens rea* of first-degree murder and that the intent to commit grievous bodily harm is its junior partner in the second degree. That, of course, is simply not the case. The casenote cogently points out:

"Nor does the actual intent to murder include necessarily the elements of premeditation and deliberation. The intent may be formed in an instant. Premeditation and deliberation are requirements in most cases of intentional first degree murder, but, since murder has two degrees, there may be an assault with intent to commit murder in the second degree, involving an actual but unpremeditated intent to take life."

21 Md.L.Rev. at 256.

In a nutshell, a 1932 legal digest misread an 1880 case from Tennessee and came out with an erroneous statement of law. That

misstatement was included in an approved quotation in *Webb v. State, supra.* With the misstatement now being attributed to the *Webb* case directly, it has been regularly repeated without ever having been subjected to even the most cursory analysis. *Davis v. State,* 204 Md. 44, 49–50, 102 A.2d 816 (1954); *Hall v. State,* 213 Md. 369, 375, 131 A.2d 710 (1957); *Johnson v. State,* 223 Md. 253, 255, 164 A.2d 269 (1960); *Wimbush v. State,* 224 Md. 488, 489, 168 A.2d 500 (1961); *Bird v. State,* 231 Md. 432, 436, 190 A.2d 804 (1963); *Tate v. State,* 236 Md. 312, 317–318, 203 A.2d 882 (1964); *Oakley v. State,* 238 Md. 48, 52–53, 207 A.2d 472 (1965); *Taylor v. State,* 238 Md. 424, 432–433, 209 A.2d 595 (1965); *McFadden v. State,* 2 Md.App. 725, 727–728, 237 A.2d 93 (1968); *Lawrence v. State,* 2 Md.App. 736, 738–739, 237 A.2d 81 (1968); *Simms v. State,* 4 Md.App. 160, 168, 242 A.2d 185 (1968); *Morgan v. State,* 4 Md.App. 351, 353, 242 A.2d 831 (1968); *Harding v. State,* 5 Md.App. 230, 247, 246 A.2d 302 (1968); *Smith v. State,* 6 Md.App. 114, 118–119, 250 A.2d 272 (1969); *Perez v. State,* 7 Md.App. 452, 454–455, 256 A.2d 369 (1969); *Wells v. State,* 8 Md.App. 510, 519–520, 261 A.2d 181 (1970); *Woodard v. State,* 13 Md.App. 114, 122, 282 A.2d 9 (1971); *Bremer v. State,* 18 Md.App. 291, 308, 307 A.2d 503 (1973); *Nickerson v. State,* 22 Md.App. 660, 665–666, 325 A.2d 149 (1974); *James v. State,* 31 Md.App. 666, 673–674, 358 A.2d 595 (1976); *Reed v. State,* 52 Md.App. 345, 355, 449 A.2d 448 (1982).

Fortunately, all of those statements, however often they have been repeated, are *dicta.* All but three of those cases dealt simply with the legal sufficiency of the evidence to show intent to murder. (*Davis v. State* dealt with jury instructions; *Simms v. State* dealt with probable cause for an arrest; and *Bremer v. State* dealt with the adequacy of an indictment). Each one of the legal-sufficiency cases involved the directing of a deadly weapon at a vital part of the human anatomy. Each of them, therefore, presented a situation where the evidence was legally sufficient to trigger the permitted inference of the actual intent to kill. The awkward analyses and indirect approaches to a simple conclusion were mercifully gratuitous.

Indeed, it seems as if many of the Maryland opinions, in discussing the legal sufficiency of the evidence, have confused the substantive element of a specific intent to kill with the modality of proving that element. They seem to be operating under the assumption that the specific intent to kill is something that must be proved directly and explicitly rather than inferentially. *Wimbush v. State, supra,* is a perfect case in point. Two immediately adjacent sentences, separated only by citations, state, at 224 Md. 489, 168 A.2d 500:

"The appellant admitted the assault and the intent to kill was inferable from the use of a deadly weapon directed at a vital part of the body.... In order to convict it was not necessary that a specific intent to take life be shown." (Citations omitted).

That statement, of course, is bizarre. What it says is, "Since you can infer the intent to kill, you don't have to show it."

Many of the Maryland cases are guilty of that same circular reasoning. Their reasoning is, in effect, the following:

"The appellant claims that the State has failed to prove the specific intent to kill. It is not necessary for the State to prove the specific intent to kill. It is only necessary that the State prove

In a theoretical situation, however, such as that discussed in *Jenkins v. State, supra,* where there might be found as a matter of fact a specific intent only to harm the victim grievously without any purpose to kill him,[8] there would be, by definition, no specific intent, design, or purpose that the victim should die. The intent, rather, could be quite to the contrary.

In distinguishing the intent to kill from something just as bad, but different, a helpful analogy is found in the statute law elevating certain of the more blameworthy types of murder to the first degree. Of the various modes of aggravation, the best known is that of "willful, deliberate and premeditated killing." Article 27, § 407. This particular form of aggravation applies only to intent-to-kill murder, not to the other three types. (Other modes of aggravation may raise other forms of murder to the first-degree plateau). It is the killing itself that must be premeditated, not the infliction of grievous bodily harm, not the perpetration of a felony, and not the reckless, life-endangering act. Of

---

malice [which is, in its most prominent manifestation, the intent to kill]. Malice [to wit, the intent to kill] can be inferred from the directing of a deadly weapon at a vital part of the human anatomy."

The thrust of the reasoning is, "You don't have to prove something because you can infer it."

In any event, the statement that an intent to kill need not be shown because an intent to commit grievous bodily harm will suffice is a statement that was wrong when Wharton first uttered it in 1932, and all the repetition in the world will not make it right. If it is necessary to repudiate *dicta,* we hereby do so.

8. Ponder the mean hypothetical:

"I deliberately amputated the arms and legs of my enemy for the purpose of rendering him a quadriplegic for the rest of his long and miserable life. I did not remotely desire that a merciful death should intervene to frustrate my design."

A fact finder, of course, need not believe such a statement, and probably would not. That is beside the point. The issue is: *If* the fact finder *should* explicitly find such a stated intent to be the fact, what would its legal significance be in terms of assault with intent to murder? It clearly would not establish an assault with intent to murder. It clearly would establish an assault with intent to maim, disfigure or disable.

the blameworthy mental states, the specific intent to kill has always occupied a special niche of its own. It was, of course, the prototype. It is today the only *mens rea* that rises to the first degree when premeditated. It is similarly the only *mens rea* shadowed by an inchoate junior partner of assault with intent to murder.

The legislative scheme itself, moreover, demonstrates the obvious legislative intent to restrict assault with intent to murder to the hypothesized intent-to-kill murders. It is clear that every intent to perpetrate a felony does not *ipso facto* constitute an intent to murder, lest every assault with intent to rob under Article 27, § 12, with its ten-year maximum sentence, constitute automatically an assault with intent to murder, with its thirty-year maximum sentence. If it were otherwise, every assault with intent to rape under Article 27, § 12, with its fifteen-year maximum sentence, would constitute automatically an assault with intent to murder, with its thirty-year maximum sentence. By the same token, the intent to inflict grievous bodily harm does not *ipso facto*, as a matter of law, constitute an intent to murder, lest every assault with intent to maim, disfigure, or disable under Article 27, § 386, with its ten-year maximum sentence, constitute automatically an assault with intent to murder, with its thirty-year maximum sentence. We cannot ascribe to the Legislature an intent to enact superfluous criminal statutes and contradictory sentencing provisions. *May v. Warnick*, 227 Md. 77, 83, 175 A.2d 413 (1961); *Farmers & Merchants Bank of Hagerstown v. Schloss-berg*, 306 Md. 48, 61, 507 A.2d 172 (1986); *Equitable Life Assurance Society of the United States v. Jalowsky*, 306 Md. 257, 263, 508 A.2d 137 (1986).

When the case law points out, therefore, that the "intent to murder" is not coterminous with the "intent to kill,"[9] it does not remotely suggest that it includes intents other than the intent to kill. The statement is uttered only in the

---

9. *Marks v. State*, 230 Md. 108, 112, 185 A.2d 909 (1962).

context of exempting those intents to kill that are, in terms of their blameworthiness, less than murderous. The intent to murder necessarily includes at its very core the intent to kill, but adds limiting modifications as well. The intent to murder comprehends the unjustified, unexcused, and unmitigated intent to kill.[10] Many instances of justifiable or excusable homicide, such as various forms of self-defense, involve the specific intent to kill. Certain forms of mitigated homicide, such as hot-blooded response to legally adequate provocation, similarly involve a specific intent to kill. The reason for distinguishing the intent to murder from the intent to kill is to exempt from the embrace of the assault with intent to murder statute those intents to kill that would be justified, excused, or mitigated, should death result. The intent to murder, in contrast to the intent to kill, is a more restrictive, not a more enveloping term. That it does not embrace all intents to kill does not suggest that it embraces something other than the intent to kill.

The logically compelling conclusion that an intent to murder necessarily requires a specific intent to kill has been recognized by W. LaFave & A. Scott, *Criminal Law* (1972), at 607, n. 27:

"Some aggravated-assault statutes are worded 'with intent to murder,' others 'with intent to kill." The former wording, like the latter, requires a specific intent to kill; this is so even though murder itself may be committed without an intent to kill, as with murder with intent to do serious bodily harm, depraved-heart murder and felony murder."

Of the twelve types and degrees of homicidal *mentes reae*, therefore, but two remain to support a conviction for assault with intent to murder:

---

10. *Id.*

|                              | 1                               | 2 | 3 | 4 |
|------------------------------|---------------------------------|---|---|---|
| 1st° MURDER (Aggravated)     | PREMEDITATED INTENT TO KILL     |   |   |   |
| 2nd° MURDER (Normal)         | INTENT TO KILL                  |   |   |   |
| MANSLAUGHTER (Mitigated)     |                                 |   |   |   |

Intentional Killing     Unintentional Killing

Thus, assault with intent to murder is not the inchoate form of murder generally, but only the inchoate form of one particular type of murder. One can intend only that type of murder which, if done, would be intentional. It is a truism that one cannot intend the unintended. What is called for is a more precise definition. It must include the "intent to kill," so as to eliminate the other three vertical files or basic types of criminally homicidal *mentes reae*. It must also include "under circumstances such that if the victim should die, the crime would be murder," so as to eliminate those less blameworthy intents to kill that are 1) justified or excused, thereby totally exculpating the assailant, or 2) are mitigated, thereby lowering the degree of guilt to the manslaughter level.

*The First Full-Truth:*

ASSAULT WITH INTENT TO MURDER IS AN ASSAULT
WITH INTENT TO KILL UNDER CIRCUMSTANCES
SUCH THAT IF THE VICTIM SHOULD DIE, THE
CRIME WOULD BE MURDER.

With that definition before us, we turn to the facts of the present case. With ample support in the evidence, the trial judge found that the appellant did, indeed, assault Frank Rizo four times with a knife with the intent to kill him. We are within the proper vertical column of hypothesized intent-to-kill murder. The conviction is still on the tracks. It remains to be seen whether we are at the proper horizontal rank or level of hypothesized blameworthiness.

*The Second Half-Truth:*

MALICE IS THAT WHICH SEPARATES MURDER
FROM MANSLAUGHTER.

Once again, the key to understanding is in thinking plural. Malice, like Gaul, is divided into three parts. It is not a singular phenomenon, but a compound one. Some things may be true about one of the parts which are untrue of another. The evidence which may go to prove one of the parts may be utterly irrelevant to proof of another. The hazard in the use of the compound term is that people, thinking exclusively about one of the parts, inadvertently speak in terms of the whole. "Ahah," said the blind man, feeling the tail of an elephant, "so an elephant is like a snake."

"Malice" is a semanticist's nightmare. It is foolhardy even to use the term without at least a rudimentary understanding of where it came from and what changes it has undergone. To begin with, it does not stand alone but is almost always followed by the now vestigial appendage "aforethought," a vestige that nonetheless sheds light on much of the total phrase's original meaning. Over the centuries, "malice aforethought" lost a great deal of its

original content but has taken on a great deal of new content.

It is a source of inevitable confusion that "malice aforethought" today is neither "malicious" nor "thought of beforehand." It has, of course, become commonplace to lawyers that "malice" connotes nothing which would strike a layman as "malicious." It has come to mean simply an intention to commit a criminal act with no hatred or ill-will required. As Holmes noted:

> "It is just as much murder to shoot a sentry for the purpose of releasing a friend, as to shoot him because you hate him. Malice, in the definition of murder, has not the same meaning as in common speech, and, in view of the considerations just mentioned, it has been thought to mean criminal intention.

> .     .     .     .     .

> [A] newly born child is laid naked out of doors, where it must perish as a matter of course. This is none the less murder, that the guilty party would have been very glad to have a stranger find the child and save it." [11]

Equally to the point is Professor Perkins:

> "In ordinary conversation the word 'malice' conveys some notion of hatred, grudge, ill-will, or spite, but no such idea is incorporated in the legal concept of 'malice aforethought.' ... [T]his crime may be perpetrated without the slightest trace of personal ill-will. Illustrations include the case of a mother who kills her illegitimate offspring to hide her own disgrace, feeling at the time no hatred toward it or any other person and even having the yearnings of a mother's love toward the innocent victim— 'loving its life just less than her own reputation.' There may be added the case of the husband who killed his wife at her request, because his love was too great to permit the continuance of her suffering from a hopeless disease.

---

11.  O.W. Holmes, *The Common Law* 53 (1881).

Even such extreme cases as these have been held to fill every requirement of malice aforethought...." [12]

The concept of malice aforethought first entered English common law through a series of Tudor statutes between 1496 and 1547, which provided that all murders carried out with "malice prepense" or "malice aforethought" would be non-clergyable (to wit, capital) and that other murders would be clergyable (to wit, non-capital).[13]

This distinction was the first effort by the common law to separate, for punishment purposes, a more heinous degree of murder (that perpetrated with malice aforethought) from a still-criminal but extenuated form of murder (that perpetrated without malice aforethought). This first effort at mitigation did not distinguish malice from non-malice. The malice component was shared by both degrees of murder. The stress was on the participle "aforethought." The only distinction was between malice *aforethought* and malice *non-aforethought*.

Both degrees of murder possessed the necessary malice component. Malice embraced the intent element, at that time only the intent to kill. (The other forms of murderous intent, the three varieties of "implied malice," would enter the common law approximately 100 years later). Malice also included, as a necessary element, that the intent to kill was without justification or excuse (for example, not in self-defense and not in line of duty), for either excuse or justification would have totally exculpated the defendant. The distinction was that of whether the unjustified and unexcused intent to kill (the malice) had been thought out well in advance or whether the unjustified and unexcused

---

**12.** R. Perkins, *Criminal Law* 35 (2d ed. 1969).

**13.** *See generally* R. Moreland, *The Law of Homicide* (1952); Green, *The Jury and the English Law of Homicide, 1200–1600*, 74 Mich.L.Rev. 413 (1976); Kaye, *The Early History of Murder and Manslaughter*, 83 Law.Q.Rev. 365, 569 (1967); Michael & Wechsler, *A Rationale of the Law of Homicide*, 37 Colum.L.Rev. 701, 1261 (1937). *And see Smith v. State*, 41 Md.App. 277, 289, 398 A.2d 426 (1979).

intent to kill (the malice) had been a spontaneous and spur-of-the-moment decision.

The purpose of the distinction was clear. The common law was striving to separate qualitatively the two essential kinds of unlawful homicide then perplexing the Realm—1) the deliberate killing from ambush on a lonely forest trail or in a darkened London alley from 2) the impulsive killing in a village brawl as one combatant angrily smashed in a head with a quarterstaff or ran through a stomach with knife or sword. This latter variety of homicide—chaud medley or chance medley (not condoned but readily understood by a rude and riotous folk)—would someday give rise to modern manslaughter. The first effort to extenuate it, however, was along the timeline. It was initially deemed less blameworthy (to wit, mitigated) because it was a spontaneous, spur-of-the-moment decision without malice aforethought, in contradistinction to the more dreaded bushwhackings and ambuscades carried out with malice aforethought.

Thus it came to be that the total concept of "malice aforethought" embraced three separate but related elements. "Malice" supplied the first two components:

1) The intent to kill (later to be joined by three alternative, sibling intents);

2) The absence of justification or excuse;

and "aforethought" supplied the third component:

3) The absence of mitigation.

"Malice aforethought" then underwent a century of rapid development, as "malice" multiplied fourfold and "aforethought" shriveled up to the point of ultimate disappearance. It was the intent component of malice that underwent the rapid growth, as the original "express" malice was joined by the three forms of "implied" malice. That growth need not concern us here.

It was the evaporation of "aforethought" to the point where nothing was left that led to the birth of manslaughter as an alternative mitigating device.

"Aforethought," in its pristine state, connoted that the intention to kill had existed some appreciable time before the actual execution of the deed. It connoted the same thing by way of preplanning that premeditation connoted early in the 19th century (when it entered the law as an attempt to rejuvenate the earlier meaning of "aforethought") and significantly more by way of preplanning than premeditation connotes today (premeditation having in the meantime suffered a semantic erosion of its own). The word "aforethought" today is devoid not simply of an ordinary, layman's meaning, but of any meaning at all, even as a term of art. As is pointed out by Professor Perkins:

"Undoubtedly the word 'aforethought' was added to 'malice' in the ancient cases to indicate a design thought out well in advance of the fatal act. But as case after case came before the courts for determination, involving killings under a great variety of circumstances, there came to be less and less emphasis upon the notion of a well-laid plan. And at the present day the only requirement in this regard is that it must not be an *after*thought. 'Killing with malice' is sufficient of itself to negative any possible notion of an afterthought, and apart from the historical background the word 'aforethought' would not be needed." [14]

To the same effect is Professor Purver:

"Just as the word 'malice' confuses and misleads, the word 'aforethought' likewise muddles thinking:

'The fact that malice aforethought means merely that malice must exist at the same time as the act, in effect makes "aforethought" meaningless surplusage, since the requirement is satisfied by the presence of malice or "concurrent" malice rather than an antecedent malice. The unimportant character of the adjective "aforethought" is seen in the fact that in many opinions "malice" and "malice aforethought" are used inter-

---

**14.** R. Perkins, *Criminal Law* 34–35 (2d ed. 1969) (Emphasis in original).

changeably and that in many "aforethought" is itself omitted.'

Since today 'aforethought' may be 'as instantaneous as successive thoughts of the mind' or 'on the spur of the moment,' the word no longer serves its original function of drawing attention to the duration of the deliberation to kill as the criterion for distinguishing murder from other homicides." [15]

Once "aforethought" was drained of all content, the mitigating device of being "non-aforethought" had disappeared. All murder had become theoretically unmitigated and, therefore, capital. England still sought, however, to distinguish those cold-blooded killings transacted on lonely forest trails and in darkened London alleys from the hot-blooded killings transacted at Donnybrook Fair. If the timeline for decision-making would no longer serve, some other device needed to be found.

The response to the felt need of the time led to the birth of the crime of manslaughter, as a mitigated form of criminal homicide less heinous than murder. The prototypal form of manslaughter became "hot-blooded response to legally adequate provocation." The prototypal form of legally adequate provocation was chaud medley or chance medley (what we later would call "mutual affray"). The same phenomenon was, therefore, being extenuated in the mid–1600's that had earlier been extenuated in the mid–1500's. Only the rationale for the extenuation had undergone a change. Where once we had been concerned with the length of time in which the intent to kill had been formulated, we later were concerned with the reason for the formulation of that intent to kill. Chance medley was ultimately joined by other forms of legally adequate provocation, such as a battery upon one's person, the discovery of one's spouse in the act of adultery, and being subjected to

---

15. Purver, The Language of Murder, 14 U.C.L.A. L.Rev. 1306, 1309 (1967), *quoting from* 1 Wharton, *Criminal Law and Procedure* § 243, at 527 (Anderson ed. 1957).

an unlawful arrest. On a larger scale, the "rule of provocation" was joined by other varieties of mitigation, such as the various imperfect defenses.

This shift in the meaning of malice aforethought was accompanied by a shift in its position. Where it had once served as a line of demarcation between non-clergyable (capital) murder and clergyable (non-capital) murder, it became the line of demarcation between all murder (all of which was then non-clergyable and, therefore, capital) and manslaughter (which was clergyable and, therefore, non-capital).

The term "malice" had to pick up the ball which had been dropped by its now-dead partner "aforethought." "Malice" (sometimes followed by its now-useless appendage and sometimes not) had come to embrace all three of the components [16] once embraced by the predecessor term:

1) The intent to kill (or one of the alternative intents);

2) The absence of justification or excuse; and

3) The absence of mitigation.

The linguistic snare has been that the umbrella term "malice" has been carelessly used to refer to any one of its component parts individually, especially the first and third components. It is frequently used to denote the intent element. It is frequently used to denote the absence of mitigation. What is true of one is not necessarily true of the other.

When, therefore, the statement is made that "malice is that which separates murder from manslaughter," strange and incorrect conclusions may follow. The argument is frequently made that the proof of the intent element is tantamount to proof of "malice" and, therefore, establishes a case of murder. Such bizarre conclusions follow inevitably from the employment of the half-truth. The reality is, of course, that the intent element is shared by murder and

---

16. R. Perkins, *Criminal Law* 48 (2d ed. 1969); Clark & Marshall, *Law of Crimes* 561 (6th ed., Wingersky rev. 1958).

manslaughter alike and does nothing by way of selecting between them.

*The Second Full Truth (Preliminary Draft):*

ONE OF THE COMPONENT PARTS OF MALICE (THE ABSENCE OF MITIGATION) IS THAT WHICH SEPARATES MURDER FROM MANSLAUGHTER. THE OTHER TWO COMPONENTS OF MALICE (THE REQUISITE INTENT, ANY ONE OF FOUR, AND THE ABSENCE OF JUSTIFICATION OR EXCUSE) ARE SHARED BY MURDER AND MANSLAUGHTER IN COMMON.

As a principle of law, that is a bit cumbersome. Except when we are walking through the full creative process for purposes of learning, we do not need the long form of the principle. It tells us more than we need to know. Eliminating the common denominator components and going straight to the single component that makes the desired distinction, we can state the principle more efficiently.

*The Second Full Truth (Final Draft):*

THE ABSENCE OF MITIGATION IS THAT WHICH SEPARATES MURDER FROM MANSLAUGHTER.

█ With the proper principle of law before us, we turn to the assault with intent to murder conviction now before us for review. We hypothesize the death of the assault victim and inquire as to whether that death would have been a murder or a manslaughter. The form of mitigation that was clearly at issue in this case was hot-blooded response to legally adequate provocation.

In *Whitehead v. State,* 9 Md.App. 7, 10–11, 262 A.2d 316 (1970), Judge Orth set out fully the elements of provocation:

"[T]here may be a homicide which would otherwise be murder which is reduced to manslaughter by circumstances of alleviation or mitigation. Such a case is where the circumstances surrounding the homicide establish that it

was provoked. For the 'Rule of Provocation' to be invoked there are four requirements:

(1) There must have been adequate provocation;

(2) The killing must have been in the heat of passion;

(3) It must have been a sudden heat of passion—that is, the killing must have followed the provocation before there had been a reasonable opportunity for the passion to cool;

(4) There must have been a causal connection between the provocation, the passion, and the fatal act."

Significantly, Judge Allen found, as a matter of fact, each and every element that goes to establish the mitigation of hot-blooded provocation. The assault in question was the immediate and proximate by-product of an incident that began on the parking lot of Hammerjack's Night Club in South Baltimore. The 20–year-old appellant had been attending a late-night concert. He met a young lady, Mary Carr, and ventured to speak with her as she was sitting in her automobile. He joined her for a brief moment in that automobile. It was at that point that the ultimate assault victim, Frank Rizo, intervened. Rizo had had a lot to drink. He announced to the appellant that "the lady did not want to be bothered any more." As the appellant alighted from the automobile, Rizo, reinforced by a small posse of his friends, beat up the appellant. They all continued to pummel him until some bouncers from the nightclub stopped the fight.

In terms of the presence of a legally adequate provocation, we have, by the very worst scenario from the appellant's point of view, a mutual affray. We have, by the far more probable scenario, a battery (and a severe and vicious one at that) perpetrated by Rizo and his friends upon the appellant. Indeed, the explicit findings of Judge Allen established just such a battery:

"The Court: . . . I believe that Rizo beat the devil out of this young fellow down at Hammerjack's. I think he

took, he may have sucker punched him, and beat him up badly . . . ."

The existence of a legally sufficient provocation was found, as a matter of fact. In terms of the response still being in the "sudden heat of passion," before "there had been a reasonable opportunity for the passion to cool," the findings of fact clearly established this element as well. As soon as the bouncers had rescued the appellant from his assailants, Frank Rizo left the scene with Mary Carr in her Dodge Dart. The appellant, accompanied by his friend Michael Burns, immediately gave pursuit in the appellant's Corvette. At one point, one of the cars bumped into the other. When they were both stopped at a red light, the appellant leaped out of the Corvette, went over and opened the passenger door of the Dart, and there stabbed Rizo four times. Judge Allen could not be certain as to whether the entire episode, from leaving the parking lot at Hammer-jack's to the stabbing, had taken, "a couple of minutes, five minutes, ten minutes, I don't know how long it takes to get from Hammerjack's down to where the stabbing takes place." That it was found to be still within the time frame of "sudden passion," however, seems clear. Judge Allen's findings of fact included:

"I think two separate incidents are connected in time and sequence, but I don't think you can separate them."

The elements of the stabbing having been "in the heat of passion" and the causal connection between the initial act of provocation (the battery) and the hot-blooded stabbing may be considered together. Once again, the explicit findings of fact leave no doubt:

"I think that proves the State's point, that the young man was angry because he had gotten the devil beat out of him by this guy Rizo, never seen before and he pulled up behind his car and stabbed him."

Judge Allen went on to describe the appellant's motivation being that of "get rid of him for having gotten a beating." His final conclusion could not have been more clear:

"You don't have to argue that. I agree with you on that. I think this man was angry about the beating he had gotten, that is why this happened. He is not the type, hunting people with knives and trying to hurt them. Basically he is a nice fellow, he had an unusual experience. The man beat the devil out of him, apparently for nothing as far as we can ascertain. And that is where the malice arose. He was angry. That was an act of revenge. This was hot blood."

The clear and explicit findings of fact establish unequivocally a hot-blooded response to a legally adequate provocation. Had the assault victim died, the resultant homicide would have been mitigated down to the manslaughter level of blameworthiness. That cannot support the inchoate crime of assault with intent to murder.

How, then, can we explain the result in this case? The clear answer is the pervasive presence of the second and third half-truths in the case law advanced by the representative of the State. It is revealing to note the ages of the cases urged upon the trial judge by the assistant prosecutor as the applicable cases on the element of malice: *McFadden v. State,* 2 Md.App. 725, 237 A.2d 93 (1968); *Morgan v. State,* 4 Md.App. 351, 242 A.2d 831 (1968); *Shenberger v. State,* 234 Md. 363, 199 A.2d 233 (1964); *Bird v. State,* 231 Md. 432, 190 A.2d 804 (1963); *Perez v. State,* 7 Md.App. 452, 256 A.2d 369 (1969); and *Tate v. State,* 236 Md. 312, 203 A.2d 882 (1964).

With the help of a hefty push by the State, the trial judge slipped on the linguistic banana peel of "malice."

*The Third Half-Truth:*
## ONE MAY INFER MALICE FROM THE DIRECTING OF A DEADLY WEAPON AT A VITAL PART OF THE HUMAN ANATOMY.

There was indisputably established in this case the directing (four times, no less) of a deadly weapon (a knife) at a vital part of the human anatomy (the abdominal area,

just below the rib cage). From that predicate fact, what is it precisely that may be permissibly inferred?

From the more general proposition of both logic and evidence that a person intends the natural and foreseeable consequences of his actions, we may infer from the potentially lethal strokes the intent to kill (or, in the alternative, the intent to commit grievous bodily harm). In this case, the trial judge legitimately inferred the existence of the intent to kill. That intent constitutes one of the three necessary components of malice. That component, however, was never in question.

At issue in this case was a very different component of malice—the absence of mitigation. The only issue in serious dispute in this case was whether the intent to kill was cold-blooded (malicious) or hot-blooded (non-malicious). The directing of a deadly weapon does not help us in that regard. The hot-blooded administering of lethal strokes can be just as well-aimed and well-directed as the cold-blooded administering of such strokes.

If the court, with the assistance of counsel, had focused on the precise issue in this case, the verdict could never have gone awry. The only issue was that of whether the homicidal attack was mitigated by hot-blooded response to legally adequate provocation. With respect to each of the constituent elements, that was found to be the case.

The problem here was not in getting the right answer but in asking the right question. The significance of the right answer was lost when the judge was persuaded to ask the wrong question.

The state's attorney dazzled the judge, as the attorney general would dazzle us, with a verbal "shell game," wherein the shifting connotations of malice are moved around faster than the eye can see. The law urged upon the judge spoke not of the absence of mitigation as that which separates murder from manslaughter, but of malice. With the

use of the more general, abstract term, the court embarked on a false quest.

From that point on, error was almost inevitable. The court was looking for malice. The case law told the court that malice may be inferred from the directing of a deadly weapon at a vital part of the human anatomy. Therefore, malice was found to be present. Therefore, the verdict was guilty of assault with intent to murder.

When the general umbrella term is used, the error can sometimes be exceedingly difficult to detect. When precise and specific reference is made to the component parts, however, error is virtually impossible.

Although the intent may be inferred from the act itself, it may not be inferred that the intent was unexcused or unjustified or that the intent was unmitigated. A policeman on duty directs a deadly weapon at a vital part of the human anatomy of a fleeing felon; that does not suggest the absence of justification. The salaried executioner directs a deadly weapon (the cyanide capsule, the electric current, the hangman's noose) at a vital part of the doomed convict; that does not suggest the absence of justification. The victim, fearing for his own life, directs in self-defense a deadly weapon at a vital part of his assailant; that does not suggest the absence of excuse or justification. By the same token, the outraged victim of a battery or the outraged spouse discovering an adultery directs a deadly weapon at a vital part of the human anatomy of the provocateur; that does not suggest the absence of mitigating fury.

One part of malice may, indeed, be inferred from the lethal stroke. One part of malice is, indeed, that which separates murder from manslaughter. They are not, however, the same part. There's the rub! The thing that may be inferred from the directing of a deadly weapon at a vital part of the human anatomy is not that which separates murder from manslaughter; the thing that separates murder from manslaughter may not be inferred by the directing

of a deadly weapon at a vital part of the human anatomy. That would never present a problem if we did not insist upon giving both of those very different things the same name.

### *The Third Full Truth (Preliminary Draft):*

ONE OF THE COMPONENT PARTS OF MALICE (THE INTENT TO KILL) MAY BE INFERRED FROM THE DIRECTING OF A DEADLY WEAPON AT A VITAL PART OF THE HUMAN ANATOMY. THE OTHER TWO COMPONENTS OF MALICE (THE ABSENCE OF JUSTIFICATION OR EXCUSE AND THE ABSENCE OF MITIGATION) MAY NOT BE SO INFERRED.

As a principle of law, that also is a bit cumbersome. It tells us more than we need to know. Eliminating the negatives and going straight to the affirmative evidentiary statement, we can phrase the principle more efficiently.

### *The Third Full Truth (Final Draft):*

THE INTENT TO KILL MAY BE INFERRED FROM THE DIRECTING OF A DANGEROUS WEAPON AT A VITAL PART OF THE HUMAN ANATOMY.

The precise findings of fact in this case established that the potentially deadly attack was mitigated by hot-blooded response to legally adequate provocation. There was neither showing nor finding of that absence of mitigation that would have raised the hypothesized death from the manslaughter to the murder level. The inference of the requisite intent, common to both manslaughter and murder, obviously had nothing to do with the issue of non-mitigation. The verdict of guilty for the aggravated form of the assault was erroneous.

Because there is no question, however, about the propriety of a finding of guilty for the lesser included simple

assault and battery, it is unnecessary to remand this case for a retrial. It is only necessary to vacate the sentence for assault with intent to murder and to remand for sentencing on simple assault.

This reversal illustrates an epidemic problem in the law. In a troubled area such as this, lawyers and judges are frequently encountering not a legal problem, but a language problem. The solution is to use specific terms and to refer to the component elements of malice individually. In aggregate, those parts say it all. There is no good reason ever to use again the dangerously imprecise abstraction "malice."

Old linguistic habits, however, die hard; it will be those linguistic habits that inevitably will again call down upon our heads the full fury of Murphy's Law.

"Precision in the use of legal language is essential, particularly in the law of homicide. In a murder trial the use of a word or turn of a phrase may mark the difference between whether the accused leaves the courtroom free—or sentenced to death.

Yet the phrase 'malice aforethought,' used in defining murder, peers at us like a demon through the dust of more than four hundred years of history, lying in wait to clutter statutes and confuse juries. In examining the historical background of the phrase, one probes the roots of a term which, through withering on the vine, lives on to strangle the penal codes of the several states." [17]

JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT TO ENTER A JUDGMENT OF CONVICTION FOR BATTERY AND SENTENCING THEREON. COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.

---

17. Purver, *The Language of Murder,* 14 U.C.L.A. L.Rev. 1306 (1967).