521 A.2d 811

**Sigismund Nathaniel SANGSTER**

**v.**

**STATE of Maryland.**

**No. 751, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

March 5, 1987.

458

Arthur A. DeLano, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Baltimore, Arthur A. Marshall, Jr., State's Atty. for Prince George's County and David M. Simpson, Asst. State's Atty. for Prince George's County, on brief, (Upper Marlboro), for appellee.

Argued before WEANT, ALPERT and ROSALYN B. BELL, JJ.

ALPERT, Judge.

Being disinclined to spend the next one hundred eleven years behind bars, appellant, Sigismund Nathaniel Sangster, asserts, among other things, that he was denied his constitutional right of confrontation at the hearing in which it was determined that he was mentally competent to stand trial. This case began with a "drug bust" which ended in a shootout between the police and the appellant. Evidence at trial in the Circuit Court for Prince George's County revealed the following.

On the morning of May 2, 1985, police officers from the Prince George's County Police Department's Vice Control Section and Emergency Service's Team executed a search and seizure warrant at 5725 Chillum Heights Drive, Apartment 101. The affidavit in support of the search warrant alleged that individuals were selling "nickel bags" of marijuana through a peephole in the apartment door.

The police went to the apartment, yelled "county police," and then broke down the front door with a battering ram. They secured the living room, kitchen and bathroom of the apartment, and then sought access to the bedroom. The door to the bedroom was barricaded. After Officer Sinton hit it with his shoulder and shield, Officer Magruder followed up with a battering ram. With the aid of the battering ram, the door would open approximately two inches, but it would shut tightly once the ram was removed.

No sounds were heard from inside the bedroom until shots were fired. This gunfire hit Officers Sinton and McKimmie. The police returned the gunfire by firing a shotgun through the unopened door. After gunfire was exchanged, Officer McKimmie tried to engage the occupant of the room in conversation. He told the occupant that "this is the county police, throw the gun out the window, go to the window, put your hands out the window, put your

hands on the glass, or put them out the window." At first, there was no response, but later the occupant yelled, "Come in and get me, man." Gunfire was again exchanged and the police heard a yell from inside the room, indicating that the occupant had probably been injured. The police then ceased their fire, and the occupant remained barricaded in the room for approximately five hours (at which time the occupant told police negotiators he had been shot and needed medical attention).

When appellant came out of the bedroom, he was "leaning over slightly" with "both hands secreted in his jacket." Sergeant William Spalding ordered the appellant to stop and take his hands out of his jacket and put them up in the air so that they were in plain sight. The appellant did not respond and instead made a motion with his hand which appeared to move from his jacket toward the police. Sergeant Spalding ordered Officer McKimmie to fire an Arwen[1] to disarm and disable Mr. Sangster. The Arwen was shot, projecting a rubber projectile which struck the appellant, knocked him back, and caused his hands to move from his jacket.

At the conclusion of the State's case, the appellant moved for a judgment of acquittal. This motion was denied and the defendant began to present his case.

Appellant produced four witnesses who testified that they were residents of appellant's building present during the incident, but had not heard the police announce who they were before entering appellant's apartment. Mr. Sangster's next-door neighbor testified that appellant had previously been beaten by the police, and his apartment had also been broken into shortly before the raid.

In addition, appellant testified on his own behalf. He stated that on May 13, the date of the incident, that he was sitting in his bedroom when he heard somebody walking in

---

1. An "Arwen" is a gun used by the police to disable and disarm an individual. The gun fires a rubber, rather than metal, projectile.

the living room of his apartment who said, "[E]verybody come out with their hand up." Appellant testified that he called out, "it's just me alone inside." He then said:

> So while I was going to the front door, I got shot and I—and I say—they still say everybody come out with their hand up. So I said I ain't coming out here.

Q. What did you do after you were shot?

A. I went back where I was sitting down. And I take up—

Q. Can you speak slower please?

A. Yeah. I went where I was sitting down first. And pick up—I went where I was sitting after they shoot me. And take a gun I did have and shoot the door back to them. And they still shooting and shooting again.

Q. What did you see out the window?

A. I see somebody outside with a gun on me. I shoot at them.

Q. Did you know that was a policeman?

A. I don't know who he was. I saw one person first, after that I saw about three people knocking on the window.

Q. So then what did you do?

A. Well, the person that have a gun on me, I was shooting on him. I shoot at him one time. The they knock on the window. While they was pushing the gun through the window I was trying to help myself by moving the—some furniture inside trying to keep bullets off me.

Q. Why didn't you just walk out the door?

A. Because they shoot. I didn't reach the front door—I didn't reach the door and they shoot me.

Q. Why didn't you open the door and walk on out?

A. They going to shoot me.

Thus, appellant asserted that he didn't know who was in his apartment when he fired the first three shots (the shots which injured the policemen), and thereafter, he did "not know what to do." Although the police had told him to

come out of his apartment, appellant feared that if he came out he would be shot again. In fact, when he did come out of the bedroom, he was shot in the eye (an injury which caused him to lose the eye).

At the conclusion of his case, appellant renewed his motion for judgment of acquittal. This motion was denied and the case was submitted to the jury, which convicted appellant and found him criminally responsible for assault with intent to murder, use of a handgun in the commission of a crime of violence, battery, assault, and possession of marijuana. Appellant was also convicted of, but found not criminally responsible for, assault with intent to avoid lawful apprehension. On May 21, 1986, appellant was committed to the custody of the Commissioner of Corrections for a period of one hundred and eleven years.

A timely appeal was filed on June 5, 1986, and the following questions presented:

I. Did the trial judge fail to determine competency upon testimony and evidence presented on the record [and did the trial judge err in denying appellant the right to confrontation]?

II. Did the trial judge err in refusing to instruct the jury that assault and battery were not crimes of violence under Article 27 § 36B?

III. Did the trial judge err in instructing the jury on the elements of assault with intent to murder?

IV. Did the trial judge err in refusing to give an instruction on the "castle doctrine?"

### I. *Competency*

■ Section 12–103 of the Health General Article states that:

If, before or during a trial, the defendant in a criminal case appears to the court to be incompetent to stand trial or the defendant alleges incompetence to stand trial, the court shall determine, on evidence presented on the

record, whether the defendant is incompetent to stand trial.

Md. Health-Gen. Code Ann. § 12–103 (1982 and 1986 Cum. Supp.). The provisions of this section are mandatory, *Jones v. State,* 280 Md. 282, 372 A.2d 1064 (1977), and dictate that the court take affirmative action to determine the competency of a defendant to stand trial once the issue is raised. *Hill v. State,* 35 Md.App. 98, 369 A.2d 98 (1977); *Rozzell v. State,* 5 Md.App. 167, 245 A.2d 917 (1968); *Strawderman v. State,* 4 Md.App. 689, 244 A.2d 88 (1967).

■ The test for determining competency is whether an accused is able to (1) understand the nature of the proceedings against him and (2) assist in his own defense. *Langworthy v. State,* 46 Md.App. 116, 416 A.2d 1287 (1980), *cert. denied,* 450 U.S. 960, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981). Both parts of the competency test must be established before the accused can be tried. *Raithel v. State,* 280 Md. 291, 299–300, 372 A.2d 1069 (1977). All doubts and ambiguities are resolved in favor of incompetency. *Langworthy,* 46 Md.App. at 129–30, 416 A.2d 1287. One of the "primary purposes of the [competency] laws [is] to prevent an insane person from being tried for an alleged criminal offense until he has recovered his reason...." *Jones,* 280 Md. at 289, 372 A.2d 1064; *Rowe v. State,* 234 Md. 295, 309, 199 A.2d 785, *cert. denied,* 379 U.S. 924, 85 S.Ct. 281, 13 L.Ed.2d 336 (1964).

■ In the case *sub judice,* appellant raised the issue of his competency to stand trial. He presented evidence from a psychiatrist,[2] Dr. Richard Epstein, that he suffered from a chronic schizophrenic disorder and that because of this

---

**2.** In *Colbert v. State,* 18 Md.App. 632, 642, 308 A.2d 726 (1973), we held that the question of competency is a medical problem and any opinion rendered to the court should be presented by a medically trained psychiatrist in order to be admissible. *Id.* The opinion of a medical expert is not, however, required before the court may make a determination of competency beyond a reasonable doubt. *Hill,* 35 Md.App. at 110, 369 A.2d 98.

mental disorder he could neither understand the nature of the proceedings nor assist in his defense.

The State called no witnesses in rebuttal, but apparently submitted a report[3] from Clifton T. Perkins State Hospital in which it was concluded that the appellant was competent to stand trial. The appellant objected to the trial judge's consideration of the Perkins report since it only contained the doctor's conclusions without any supporting facts. He contended that he should have had an opportunity to cross-examine the Perkins staff as to the basis of their conclusions, before competency was determined.

Appellant cites *Gregory v. State,* 40 Md.App. 297, 391 A.2d 437 (1978) for this contention. In *Gregory,* we held that the admission of a Perkins report which opined on the defendant's criminal responsibility violated his right to confrontation because the report was admitted generally for the truth of the matter asserted (and not for a limited purpose). Judge Wilner, speaking for the court, explained:

> We have here not the routine record of a person's birth, or death, or body temperature, nor any other similar statement of fact or condition objectively ascertained, generally reliable and normally undisputed, and free from any motive to record falsely. We are dealing with the opinions of supposed expert witnesses, who, in this document, are giving testimony not only as to appellant's mental condition, but, more importantly, as to whether or not he is criminally responsible. The document was offered without limitation as to purpose, and therefore for its truth. Thus, the jury was not merely advised of the fact that three staff psychiatrists had formed certain opinions; it was asked to accept as true—*i.e.,* to believe— the opinion of these three physicians that appellant was "sane" at the time he entered the bank.

The case *sub judice* is distinguishable from *Gregory.* In that case the (out of court) opinion evidence went to the

---

**3.**  *See infra* n. 6.

very heart of the State's case, *i.e.*, it was introduced for the purpose of establishing criminal responsibility—an accusatory purpose. Here, the psychiatric opinions were not offered for an accusatory purpose but only to determine whether the appellant was competent to stand trial. *Gregory* is inapposite. Instead, we look to the Maryland and Federal Constitutions to determine the scope of the appellant's right of confrontation.

### The Right of Confrontation

■ Article 21 of the Declaration of Rights of Maryland and the Sixth Amendment to the United States Constitution (made applicable to the states through the due process clause of the Fourteenth Amendment) guarantee the right "in all criminal prosecutions ... to be confronted with the witnesses against the defendant." U.S. Const. amend. VI; Md. Const. art. 21. *See also Tichnell v. State,* 290 Md. 43, 55, 427 A.2d 991 (1981) (right to confrontation is guaranteed by state and federal constitutions and is considered a fundamental right). Competency is an issue which, once raised, must be determined *before* the State may continue prosecuting the defendant. *Raithel v. State,* 280 Md. 291, 299–300, 372 A.2d 1069 (1977). The determination of a defendant's competency to stand trial does not pertain to the defendant's guilt or innocence, but is a collateral matter relevant to the ability of the accused to obtain a fair trial. *Jones v. State,* 280 Md. 282, 289, 372 A.2d 1064 (1977). Confrontation rights do not generally extend to collateral matters.[4]

---

4. Indeed, in recent years the Supreme Court has narrowly construed the confrontation clause of the Sixth Amendment. *See, e.g., Delaware v. Fensterer,* 474 U.S. 15, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (inability of expert witness to recall basis for his opinion goes to weight of evidence and does not violate defendant's right to confrontation); *Ohio v. Roberts,* 448 U.S. 56, 64, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980) (the confrontation clause generally requires a showing that a hearsay declarant is unavailable when the declarant is not present for cross-examination at trial; the hearsay statement is admissible, however, only if it bears the adequate indicia of reliability); *Wolff v. McDonnell,* 418 U.S. 539, 567, 94 S.Ct. 2963, 2980, 41 L.Ed.2d 935 (1974) (confrontation rights are not universally applicable to all

*Dowdell v. United States*, 221 U.S. 325, 330, 31 S.Ct. 590, 592, 55 L.Ed. 753 (1911).

In *Dowdell*, the Supreme Court considered a statutory codification of the Sixth Amendment, as it appeared in the Phillipine Bill of Rights. On the defendant's initial appeal, a question arose as to whether he had ever entered a plea to the charge and whether he had been present throughout the trial, as required by law. The record was unclear. In order to clarify these questions, the appellate court ordered the trial court clerk and the court reporter to certify (1) whether each was present throughout the trial, and (2) whether they had observed that the defendant was also continuously present. In considering the defendant's contention that the procedure violated his right to confrontation, because he was not present and had no opportunity to cross-examine the clerk or the court reporter, the Supreme Court said the Sixth Amendment right to confrontation

intends to secure the accused in the right to be tried, so far as facts provable by witnesses are concerned, by only such witnesses as meet him face to face at the trial, who give their testimony in his presence, and give to the accused an opportunity of cross-examination. It was intended to prevent the conviction of the accused upon depositions or *ex parte* affidavits, and particularly to preserve the right of the accused to test the recollection of the witness in the exercise of the right of cross-examination.

hearings); *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (the confrontation clause does not require excluding from evidence the prior inconsistent statements of a witness who concedes making the statements and who may be asked, at trial, to explain or defend the inconsistency between his prior and present versions); *Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (the confrontation clause does not bar the admission into evidence of every relevant extra-judicial statement made by a nontestifying declarant simply because it in some way incriminates the defendant and a jury instruction directing that the co-defendant's statement may be considered only against its source has been found sufficient to avoid offending the right to confrontation).

**468**

But this general rule of law embodied in the Constitution ... and intended to secure the right of the accused to meet the witnesses face to face, and to thus sift the testimony produced against him, has always had certain well-recognized exceptions. As examples are cases where the notes of testimony of deceased witness, of which the accused has had the right of cross-examination in a former trial, have been admitted. Dying declarations, although not made in the presence of the accused, are uniformly recognized as competent testimony.... *Documentary evidence to establish collateral facts admissible under the common law, may be admitted in evidence.*

221 U.S. at 330, 31 S.Ct. at 592 (citations omitted) (emphasis added). Thus, the court concluded that the procedure did not violate the defendant's right to confrontation because (1) the clerk and the court reporter were not asked to testify to facts concerning the defendant's guilt or innocence, and (2) they were not witnesses against the accused within the meaning of the right to confrontation.

■ Like the clerk and the court reporter in *Dowdell*, the Perkins doctors in the case *sub judice* were not "witnesses against" the defendant. They are impartial physicians assigned by the court to determine the defendant's competency to stand trial. *See Johnson v. State*, 292 Md. 405, 414, 439 A.2d 542 (1982), wherein the Court of Appeals said:

The doctors designated by the Department of Health and Mental Hygiene to examine [the defendant] are thus "not partisans of the prosecution, though their fee is paid by the State, any more than is assigned counsel for the defense beholden to the prosecution merely because he is ... compensated by the State. Each is given a purely professional job to do—counsel to represent the defendant to the best of his ability, the designated psychiatrists impartially to examine into and report upon the mental condition of the accused." *McGarty v. O'Brien*, 188 F.2d 151, 155 (1st Cir.1951), *cert. denied*, 341 U.S. 928 [71 S.Ct. 1005, 95 L.Ed. 1378] (1951).

Thus, we hold that the right to confrontation did not attach during the defendant's hearing to determine his competency to stand trial, since such a hearing is not a prosecutorial proceeding as contemplated by the State and Federal constitutions. *See State v. Correll,* 148 Ariz. 468, 715 P.2d 721, 727 (1986) (hearing to determine competency is nonadversarial and is best characterized as investigatory in nature); *People v. Williams,* 123 Mich.App. 752, 333 N.W.2d 577, 581 (1983) (constitutional right of confrontation does not extend to pretrial hearings on competency to stand trial); *Commonwealth v. Iacobino,* 319 Pa. 65, 69, 178 A. 823, 826 (1935) (no constitutional right to be confronted by or to cross-examine witnesses or members of commission appointed to ascertain competency to stand trial because such inquiries are apart, separate and distinct from that of guilt of the crime itself). *See generally Annot.,* 32 A.L.R.2d 434 (1953).

### *Hearsay*

■ Moreover, appellant's contention that he should have had an opportunity to cross-examine the Perkins' staff is misplaced when it is considered that appellant never subpoenaed the doctors whose opinions were contained in the report. In *Marlow v. Cerino,* 19 Md.App. 619, 637, 313 A.2d 505 (1974), we held that an opinion expressed in a hospital record by a qualified person is admissible into evidence as an exception to the hearsay rule, and "it is incumbent upon the person seeking to attack those opinions to call the declarant as a witness and examine him for weakness or error." *Id.,* citing 5 Wigmore, *Evidence,* §§ 1517–1561 (3rd ed. 1940); 6 *Wigmore, supra* at 1707.[5] Although appellant had an opportunity to call the Perkins

---

**5.** Effectively, this procedure permits a party to cross-examine the witness, since the witness's direct testimony is admitted in the form of the hospital record. This does not violate the general rule that a party cannot cross-examine or impeach his own witness because functionally the author of the opinion is not the cross-examiner's "own witness." *See generally* Wigmore, *Evidence* § 898 (3rd ed. 1940).

physicians to cross-examine them during the competency hearing, he failed to do so.[6] Accordingly, we hold that the trial court did not err when it considered the Perkins report in determining the appellant's competency without allowing the appellant the opportunity to cross-examine the doctors who contributed to and wrote the report. Appellant's right to confrontation did not attach during this pretrial hearing and, even if it had, appellant did not act to preserve those rights. If appellant wanted to cross-examine the physicians concerning the opinions they expressed in the hospital report, he should have called them as witnesses. Having failed to do so, he waived his right to cross-examine them at the competency hearing.

### Hearing Procedure

Finally, appellant argues that the failure to admit the Perkins report into evidence violates Section 12–103 of the Health-General Article, because the trial judge's statements indicate that he considered the Perkins report in rendering his decision[7] even though it was never formally admitted into evidence. At trial, appellant objected to the court's

---

**6.** We note that he did, however, call the same physicians during the trial to examine them as to their conclusions regarding criminal responsibility.

**7.** The relevant colloquy reads as follows:
THE COURT: Do you have any witnesses?
MR. SIMPSON: No, Your Honor, I don't have.
   If you have a copy of the report from Clifton T. Perkins—
THE COURT: I have it. It says that they are unanimously convinced that he understands the nature and the object of these proceedings, and he's able to assist in his own defense.
MR. SLATKIN: Your Honor, I'm going to object to the Court's notice and reading of their evaluation. All we have is a one or two page conclusionary statement made by the doctors with no basis in facts. I certainly believe that an opportunity to cross-examine their conclusions is more than warranted in this case.
THE COURT: All right. Anything else?
MR. SLATKIN: No, sir.
THE COURT: I'm convinced beyond a reasonable doubt that he does understand the nature and object of these proceedings. And I—and he's able to assist in his own defense.

consideration of the report because he had no opportunity to cross-examine the physicians' conclusions contained therein. Appellant never objected to the court's failure to follow the procedure outlined in section 12–103 at trial and the objection appears for the first time on appeal.

■ Although we believe that the better practice would have been to introduce the report into evidence before the judge made his ruling as to the defendant's competency, we decline to overturn appellant's conviction based on his present contention. Maryland Rule 1085 requires a party to object to a ruling in order to preserve it for appellate review. A party need not give a specific objection to the ruling, but where he does the nature of his objection is limited to that which he articulated at trial. *von Lusch v. State*, 279 Md. 255, 368 A.2d 468 (1977). In the case *sub judice*, appellant objected to the trial court's determination of competency because he believed it violated his right to confrontation. We have addressed that contention and found it incorrect as a matter of law. Appellant never objected to the determination of competency based on section 12–103 at trial and, thus, we will not consider it on appeal. Maryland Rule 1085.

■ Even without the admission of the Perkins report, the evidence contained on the record was sufficient to uphold the trial court's finding that the appellant was competent to stand trial. *See* Md. Health-Gen. Code Ann. § 12–103 (1982). The court conducted a voir dire of the appellant (out of the hearing of the jury) to determine his competence. During this proceeding, the following colloquy ensued on direct examination:

Q. Right. Who am I?

A. Mr. Eric S. Slatkin.

Q. What am I doing here?

A. Well, you supposed to be my attorney at law.

Q. What's going to happen today?

A. Well, I am going to court.

Q. Is this court? What is this?

A.  This, well, to me I would say the courthouse.
Q.  What?
A.  I would say the courthouse.
Q.  The Court knows?   What does the Court know?
A.  I say, I would say this is the courthouse.
Q.  This is the courthouse?
A.  Yeah.
Q.  And what's going to happen if you're found guilty?
A.  Well, my papers.
Q.  You mean this paper?
A.  Yeah.
Q.  What's going to happen if you are found guilty?
A.  Well, I couldn't—I'm not sure, I couldn't read, so.
Q.  What does it mean to be found guilty?
A.  What does it mean to be found guilty?   I did something wrong.

What to mean?   I wasn't guilty, I wasn't doing nothing wrong.   I was inside.

On cross-examination, the following exchange occurred:
Q.  Sir, what is your name?
A.  Sigismund Nathaniel Sangster.
Q.  Do you remember when the police shot you?
A.  Yeah.
Q.  Do you remember shooting the gun at them?
A.  Pardon me?
Q.  Do you remember shooting the gun at them?
A.  Shooting the gun?
Q.  Do you remember shooting your gun?
A.  Yes.
Q.  You remember that day, don't you?
A.  Yes.
Q.  Are you able to tell your attorney about that day?
Did you tell Mr. Slatkin about that day?
A.  Sure.
Q.  Could you tell the judge or myself about that day?
A.  Yes.

MR. SIMPSON: I have no further questions, Your Honor.

THE COURT: All right. Thank you very much, Mr. Sangster.

We think that during the hearing (and throughout the trial) the appellant evidenced an ability to understand the nature of the proceeding against him and was able to assist his counsel in his defense. Accordingly, we hold that the trial judge committed no error in so finding.

II. *Instructions Concerning the Use of a Handgun in the Commission of a Crime of Violence.*

■ Maryland Rule 4–325(c) provides that:

The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

The provisions of this rule are mandatory. The trial judge must instruct the jury on every essential point of law supported by the evidence when requested to do so. *Couser v. State,* 36 Md.App. 485, 374 A.2d 399 (1977), *aff'd,* 282 Md. 125, 383 A.2d 389, *cert. denied,* 439 U.S. 825, 99 S.Ct. 158, 58 L.Ed.2d 156 (1978); *Raley v. State,* 32 Md.App. 515, 363 A.2d 261 (1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1060 (1977).

In the case *sub judice,* appellant was charged in a multi-count indictment with, *inter alia,* eight counts of commission of crimes of violence and four counts of use of a handgun in the commission of a crime of violence. Appellant asserts that, since verdicts of guilty of use of a handgun in the commission of a crime of violence and not guilty of the crime of violence would be inconsistent and contrary to law, an accused is entitled to an instruction that he must be found guilty of a crime of violence in order to be found guilty of the use of a handgun in the commission of a

crime of violence. Appellant cites *Ford v. State*, 274 Md. 546, 337 A.2d 81 (1975) in support of his argument. That case is, however, inapposite. In *Ford*, the Court of Appeals held that in order to be convicted of use of a handgun in the commission of a crime of violence, the trier of fact must determine beyond a reasonable doubt, from the evidence, that the accused used a handgun during the commission of a felony or crime of violence. The court specifically stated:

> [A]n individual on trial for the handgun charge does not necessarily need to have been separately accused of the commission of a felony or crime of violence in an additional count or indictment before he can be charged with or convicted of the crime established in section 36B(d). And, when the trier of fact considers an indictment containing both a section 36B(d) handgun count and a felony or crime of violence count, a conviction on the former can still be sustained even if the trier of fact returns a finding of not guilty on the latter—in fact a finding of guilt under both, since they are not inconsistent, can each stand.

*Id.* at 551, 337 A.2d 81.

*Ford* notwithstanding, appellant next argues that the trial judge erred in this case when he refused to instruct the jury that assault and battery are not crimes of violence.

In *Mack v. State*, 300 Md. 583, 592, 479 A.2d 1344 (1984), the Court of Appeals enunciated a three-step test for reviewing the propriety of refusing a requested instruction. First, the reviewing court must determine whether the requested instruction constitutes a correct statement of the law. Second, the court must determine whether that law is applicable under the facts and circumstances of the case. Finally, the court must examine whether the requested instruction was fairly covered by the instructions actually given. *Id.* at 592–99, 479 A.2d 1344.

In determining whether the jury instructions given were proper, it is necessary to examine those instructions and the

exceptions raised to them. Here the judge said in pertinent part:

[The appellant] is next charged—he is next charged with an assault with intent to avoid lawful apprehension by Officer Magruder. And in that regard I will read you what the charge is.

And this charge says, according to your legislature, that if any person shall unlawfully shoot at any person, or shall in any manner unlawfully and maliciously attempt to discharge any kind of loaded arms at any person with the intention to prevent the lawful apprehension or detainer of any party for any offense, for which the said party may be legally apprehended, that person shall be guilty of a felony.

If you are convinced beyond a reasonable doubt that on May the 2nd Mr. Sangster shot at Officer Magruder, and his intention was not to let him serve this search warrant on those premises, and you're convinced of this beyond a reasonable doubt, you will accordingly find him guilty of this offense. If you're not convinced beyond a reasonable doubt that they have proven what I have just told you, you will accordingly find him not guilty of this offense.

In regards to Officer Magruder, the last offense that he is charged with is the use of a handgun in the commission of a crime of violence.

And in this regard, I instruct you as a matter of law that our legislature has said that any person who shall use a handgun in the commission of any felony or any crime of violence, as defined in another part of this code, shall be guilty of a separate misdemeanor.

And assault has been, with certain ramification, has been defined as a crime of violence.

When we use the term handgun, in this particular section, we mean any pistol, revolver or any firearm capable of being concealed on the person, including a short barreled shotgun.

If you're convinced beyond a reasonable doubt that this defendant, Mr. Sangster, used a handgun in the commis-

sion of an assault with intent to murder Mr. Magruder, you will accordingly find him guilty of this offense.

If you're not convinced beyond a reasonable doubt that he used a handgun in the particular commission of this crime of violence, you will accordingly find him not guilty of this offense.

Counts Six, Seven, Eight and Nine and Ten, Miss Porter, have to do with Officer Sinton. And in regards to Six through Ten, the same charges have been brought against Mr. Sangster concerning Officer Sinton as has been brought against Officer Magruder. So the same instructions that I have given you concerning Officer Magruder, or the various charges arising out of whatever happened to Officer Magruder, the same charges are applicable to the charges concerning Officer Sinton, and the same law is applicable.

You understand that?

THE FOREMAN: Yes.

THE COURT: Now, we go to Officer Buchanan, from Counts Eleven through Fourteen.

And he is charged with an assault to murder Officer Buchanan, an assault on Officer Buchanan, and use of a handgun in the commission of a crime of violence in regards to Officer Buchanan.

And I have already told you what those terms means.

He is lastly charged, in regards to the police officers, with an assault to murder Officer Patterson, Paul Patterson, an assault on Officer Patterson, and a use of a handgun in that regard.

I've already told you what those terms mean. And the same law is applicable to the charges that have been brought in regards to Officer Patterson.

You understand that, Miss Porter?

THE FOREMAN: Yes.

After the instructions were given, appellant took exception as follows:

MR. SLATKIN: I would also except, Your Honor, to your failure to indicate to the jury, I understand chambers, but your failure to indicate to the jury that a simple assault and battery is not a crime of violence for purposes of Count Five—

Count Five charged the appellant with unlawful use of a handgun in the commission of a crime of violence, the crime of violence being felonious assault of Officer Magruder with intent to prevent the lawful apprehension and detainer of himself (as described in count 4).

■ Appellant's contention that simple assault and battery are not crimes of violence as defined in article 27, § 441(e) is a correct statement of law. That statute defines crime of violence as follows:

The term *"crime of violence"* means abduction; arson, burglary, including common-law and all statutory and storehouse forms of burglary offenses; escape, housebreaking; kidnapping; manslaughter, excepting involuntary manslaughter; mayhem; murder; rape; robbery; robbery with a deadly weapon; sexual offense in the first degree; and sodomy; or an attempt to commit any of the aforesaid offenses; or assault with intent to commit any other offense punishable by imprisonment for more than one year.

Md.Ann.Code art. 27, § 441(e) (1982 and 1986 Cum.Supp.). Simple assault and battery are not listed as crimes within the definition. Thus, under the first step of the *Mack* test we note that the instruction appellant requested was, in the abstract, correct as a matter of law.

■ The problem with the requested instruction is that, while it is correct as a matter of pure law, it is not correct as applied to the facts and circumstances of the case. The appellant was not charged with simple assault and battery of Officer Magruder. He was charged with assault with intent to prevent the lawful apprehension and detainer of himself, a form of aggravated assault which clearly falls within the definition of a crime of violence, Md.Ann.Code

art. 27, § 441(e) (1982 and 1986 Cum.Supp.), for the purposes of establishing the crime of use of a handgun in the commission of a crime of violence. Md.Ann.Code art. 27, § 36B(d) (1982 and 1986 Cum.Supp.). Accordingly, we hold that the trial judge did not err when he refused appellant's instruction. *See Mack,* 300 Md. at 592, 479 A.2d 1344. Although it was a correct statement of law, it had no application to the facts of this case. *Id.*

III. *The Instructions Concerning Assault With Intent to Murder*

 Appellant next contends that the trial judge committed reversible error when he instructed the jury as follows:

He is charged in Count One with an assault with an intention to commit—to murder Officer John Magruder.

And when we use this term, assault with intent to murder, we mean an assault that is committed with a specific intention to kill that particular person, or with a specific intention to do what we call grievous bodily harm so that death would be the likely result of that bodily harm.

And in order for you to find Mr. Sangster guilty of this first charge you would have to be convinced beyond a reasonable doubt that, number one, that there was an assault that was committed upon Officer Magruder. And when we use this term assault we mean any intentional attempt by *force* to inflict injury on somebody else.

So you have to find, number one, that there was an assault by Mr. Sangster on Officer Magruder. And secondly that Mr. Sangster's intention was to either kill Officer Magruder or to do such bodily or serious bodily harm to him, that death would be the likely result. And lastly you would have to find that he did this without justification or that there were any mitigating circumstances.

After a full and fair consideration of all the facts and circumstances in this case, if you're convinced beyond a reasonable doubt that all the elements of this particular

charge are in this case, and they have been proven to your satisfaction, beyond a reasonable doubt, you will accordingly find him guilty of this offense.

If you're not convinced beyond a reasonable doubt that they have proven all these elements to your satisfaction, you would accordingly find him not guilty of this offense.

Although appellant failed to take exception to this instruction at trial, he asserts that this court should take cognizance of it as it is plain error affecting the rights of the defendant. *See* Md. Rule 4–325 (1986). *See also Hutchinson v. State,* 287 Md. 198, 205, 411 A.2d 1035 (1980).

Appellant relies on *Glenn v. State,* 68 Md.App. 379, 511 A.2d 1110 (1986) to support his assertion. In that case, we said there must be a specific intent to kill (without justification, mitigation or excuse) to constitute the offense of assault with intent to murder. *Id.* at 397, 511 A. 1110. An intent to maim, disfigure or disable falls short of and is inconsistent with an intent to kill. *Id.* at 393–94, 511 A.2d 1110. An intent to kill may, however, be inferred from the directing of a dangerous weapon at a vital part of the human anatomy in the absence of any justification, mitigation or excuse. *Id.* at 408–411, 511 A.2d 1110.

We agree with appellant that *Glenn* is controlling, but we do not agree with appellant's conclusion. In *Glenn* we found the trial court's instruction objectionable because it asked the jury to determine if the defendant "had the specific intent to kill or the specific intent to do grievous bodily harm." This instruction was objectionable because the specific intent to do grievous bodily harm may not be consistent with the specific intent to kill. Judge Moylan stated the following as illustrative of this discrepancy of intents:

> Ponder the mean hypothetical:
> "I deliberately amputated the arms and legs of my enemy for the purpose of rendering him a quadriplegic for the rest of his long and miserable life. I did not remotely desire that a merciful death should intervene to frustrate my design."

A fact finder, of course, need not believe such a statement, and probably would not. That is beside the point. The issue is: *If* the fact finder *should* explicitly find such a stated intent to be the fact, what would its legal significance be in terms of assault with intent to murder? It clearly would not establish an assault with intent to murder. It clearly would establish an assault with intent to maim, disfigure or disable.

*Glenn,* 68 Md.App. at 394 n. 8, 511 A.2d 1110.

The instruction in the case *sub judice* did not, however, present the same potential for error in the jury's findings. Here the jury was instructed that assault with intent to murder means "an assault that is committed with a specific intention to kill that particular person, or with a specific intent to do what we call grievous bodily harm *so that death would be the likely result of that bodily harm.*" (Emphasis added). The instruction in this case implicitly distinguished between the type of intent which was consistent with assault with intent to maim (which was never raised as an issue in this case) and the type of assault with which we are here concerned, assault with intent to murder. Thus, we hold that the trial court did not err in so instructing the jury.

### IV. *The Castle Doctrine*

Appellant's final contention is that the court erred when it refused his requested instruction on the "castle doctrine." Again, it is necessary for this court to apply the three-step test enunciated in *Mack,* 300 Md. at 592, 479 A.2d 1344, for reviewing the propriety of the refusal of a requested instruction.

In the case *sub judice,* the appellant requested the castle doctrine instruction exempting him from a duty to retreat in order to defend himself because the incident occurred in his home. This is a correct statement of law. A man has no duty to retreat if he is attacked in his own home. *Barton v. State,* 46 Md.App. 616, 618, 420 A.2d 1009 (1980); *Gainer v. State,* 40 Md.App. 382, 388, 391 A.2d 856

(1978). It is also seemingly applicable to the case at bar, for the incident occurred in the appellant's home. The requested instruction was, however, correctly refused because the castle doctrine is an exception to the retreat rule, *Gainer*, 40 Md.App. at 388, 391 A.2d 856, and no instruction was given on the retreat rule.

An examination of the instructions given indicates that the requested instruction was fairly omitted:

> When we use this term, self-defense, in any kind of case, we mean the following: 1) we mean that the defendant, and in this case Mr. Sangster, subjectively believed it necessary to assault, kill, or whatever happened in this case, to save himself from death or great bodily harm.

> And, secondly, you have to find that Mr. Sangster's belief was objectively reasonable. And that is that he had a right to believe that he was either going to get killed or somebody was going to hurt him in some respect.

> Thirdly, you have to find that he was not the aggressor. In other words, he didn't start this. And that is he did not, by the use of force, or an aggression, willingly enter into this particular fight, or—without legal excuse or provocation.

> And, lastly, you have to find that whatever force he used was not excessive under all the facts and circumstances of this case.

> Based on these four elements, that I have told you about, you have to be satisfied beyond a reasonable doubt that he did not act in self-defense.

It would be senseless to instruct the jury on the castle doctrine where no instruction was given on the duty to retreat. Accordingly, we hold that the trial judge committed no error in giving these instructions.

JUDGMENTS AFFIRMED; APPELLANT TO PAY THE COSTS.